**SIGNED THIS: January 12, 2010**

                                       **THOMAS L. PERKINS**
                              **UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HARRY E. VARGAS, | ) | No. 08-82824 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| HARRY E. VARGAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 08-8135 |
| | ) | |
| EDUCATIONAL CREDIT MANAGEMENT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter came before the Court for trial on the complaint of the Debtor, Harry E. Vargas (DEBTOR), against Educational Credit Management Corporation (ECMC) to determine the dischargeability of a student loan debt. This case involves the all too

common scenario where a debtor goes to college later in life, never works in his chosen field, and ends up saddled with a large student loan that impedes the debtor's ability to adequately prepare for retirement.

The DEBTOR, born in 1952, is a bachelor with no dependents. He first attended Sauk Valley Community College in 1988 at the age of 35. Although he studied there for 6 years, he never obtained a degree. While there, he worked as a custodian and for the student newspaper as a photographer, photo editor and production manager. After leaving Sauk Valley, he worked as a Certified Nurse's Aide for two years and in a factory sorting parts.

The DEBTOR, then 43, attended Western Illinois University in 1995 and 1996, obtaining a Bachelor of Arts degree with a major in Journalism and a minor in Communications. He then worked for a short time as an office clerk for the Illinois Migrant Council. From 1997 to 2001, he worked for Midland Press Corporation as an Electronic Print Assistant, doing data entry and file editing.

At the age of 49, the DEBTOR quit his job at Midland Press and went to work for the Salvation Army where he remains employed and for whom he performs a variety of tasks including processing donations, janitorial work and loading. Now 57, he works 40 hours per week and earns $8.00 an hour. His recent earnings history is as follows:

| Year | Earnings |
|------|----------|
| 2003 | $ 6,362 |
| 2004 | 11,543 |
| 2005 | 13,516 |
| 2006 | 13,525 |
| 2007 | 14,491 |
| 2008 | 15,757 |

The DEBTOR'S lifestyle is modest at best. He lives in a one bedroom apartment, paying rent of $400 per month. (For years he shared a one bedroom apartment with his

brother.) He drives a 1992 Dodge Dynasty valued at $650. For recreation, he watches television and plays scratch-off lotto. He spends $127.91 per month for cable TV and Internet service, including $37 extra for expanded cable channels and $6.95 extra for the STARZ channel. He is a cigarette smoker and spends $40 per month on tobacco, though he admits this amount optimistically assumes he will be able to cope with a reduced number of daily cigarettes than what he has become addicted to.

The DEBTOR filed for Chapter 7 relief on October 17, 2008. He owns no real estate. As of the petition date, his bank account balances totaled $421. He has a retirement account with a $2,000 balance. He enjoys good health. On Schedule I, the DEBTOR disclosed gross monthly wages of $1,300 and net monthly income of $1,063.21. His monthly living expenses shown on Schedule J total $1,074 for a deficit of $10.79.

The details about the student loans are sketchy at best. There is no evidence in the record of the exact amount borrowed by the DEBTOR. He testified that he obtained student loans between 1988 and 1996. After graduating from Western Illinois University in 1996, the DEBTOR testified that he began making the required loan payments on a monthly basis and continued to make the payments for a two-year period. He testified that he stopped making the payments when his income decreased and he could no longer afford them.[1]

The DEBTOR estimated that he sought and received five forbearances from his student loan lender. In 2001, he entered into a loan consolidation agreement with the lender. The evidence in the record indicates that the amount of the consolidated loan, as

---

[1] The DEBTOR'S testimony was uncontradicted and unimpeached. The DEBTOR was forthright and appeared truthful and the Court accepts his testimony as factually accurate.

3

of October 3, 2001, was $29,723, that interest was accruing at the rate of 7.125% per annum ($8.69 per diem), and that as of January 6, 2009, the loan balance was $44,743.94.

## ANALYSIS

Under Section 523(a)(8), a student loan is not dischargeable unless "excepting such debt from discharge...will impose an undue hardship on the debtor and the debtor's dependents." While the term "undue hardship" is not defined in the Bankruptcy Code, the Seventh Circuit has adopted the *Brunner* test, which requires the debtor to demonstrate by a preponderance of the evidence:

1. That the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans;

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3. That the debtor has made good faith efforts to repay the loans.

*Matter of Roberson,* 999 F.2d 1132 (7th Cir. 1993) (adopting the three-part analysis used in *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395 (2nd Cir. 1987), the "*Brunner* test").

The DEBTOR does not dispute that the debt to ECMC is for an educational loan of the kind referred to in Section 523(a)(8)(A)(i). Undue hardship is the only disputed issue.

### A. Current Inability to Repay

Under the first prong of the *Brunner* test, the DEBTOR must show that he cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the consolidated loan. A court must evaluate the debtor's present standard of living based upon his particular circumstances and actual living expenses and then determine

4

whether the forced repayment of the educational loan will preclude the debtor from maintaining a minimal standard of living. *In re Barron,* 264 B.R. 833 (Bankr.E.D.Tex. 2001).

The first prong requires the Court to estimate the amount of the monthly loan payment assuming the DEBTOR is forced to repay the loan. At $8.69 per day for interest, $264.32 is needed each month just to cover the interest accrual. As of December, 2009, the loan balance was approximately $47,650. Amortized over 10 years at 7.125% interest, the monthly payment needed to pay the loan is $556.33. Extending the repayment term to 15 years reduces the payment to $431.63.

The Court must next determine whether the DEBTOR reasonably has the ability to increase his income. The DEBTOR works full time at 40 hours per week. In this Court's view, full time employment is all that can reasonably be expected. The Court would not require the DEBTOR to obtain a second job. The DEBTOR does not now and never has worked in the field of journalism, in which he holds a bachelor's degree. No evidence was presented to show that he has the ability or talent to pursue a journalistic career, of the availability of jobs in that field or of the pay that might be expected.

ECMC focused on the fact that the DEBTOR allowed his CNA certification to lapse and has not sought to become recertified. No evidence was presented as to the availability of nurse's aide jobs or the pay rate. The DEBTOR testified that he enjoys working for the Salvation Army and has no desire to change employment.

The DEBTOR'S age must be taken into account. At 57, it is not realistic to expect the DEBTOR to embark on a new career path. Such an effort would be difficult and risky even if he had the necessary skills and desire. There is no evidence to support the position that the DEBTOR has a reasonable probability of increasing his income.

5

The Court must next consider whether the DEBTOR has the ability to decrease his expenses. At $1,074 per month, his expenses are meager on an aggregate basis. At trial, he testified that his expenses are somewhat different than listed on Schedule J. His current expenses are as follows:

| | |
|---|---:|
| Rent | $ 400 |
| Utilities | 80 |
| Phone | 57 |
| Cable and Internet | 130 |
| Food | 125 |
| Clothing | 20 |
| Health Expenses | 25 |
| Transportation | 20 |
| Car Insurance | 53 |
| Laundry | 10 |
| Tobacco | 40 |
| Recreation | 50 |
| Total | $1,010 |

It must be noted that the amounts for food, clothing, and transportation are below normal. A food allowance of $200 per month is standard and transportation expenses of only $20 per month for a 17 year old vehicle are unrealistic. A clothing expense of $20 per month is also unrealistic.

Nevertheless, ECMC contends that certain individual expenses are excessive, beginning with the cost of his cigarettes. The DEBTOR is a long-time smoker who is making an effort to cut back. Until recently, he was smoking about a pack and a half per day at a monthly cost of $184. The DEBTOR testified at trial that he is cutting back and will try to get by on $40 per month, which would buy about 5 cigarettes a day. The Court views this reduced expense as permissible.

ECMC criticized the DEBTOR'S purchase of the expanded cable television package for an extra $44 per month, alleging that the additional television stations are an

unnecessary luxury. It appears that watching television is the DEBTOR'S main activity outside of work. He has no real hobbies. Although expanded cable is not a necessity, given the particulars of the DEBTOR'S lifestyle, it is a reasonable part of his minimal standard of living.

ECMC also objects to the DEBTOR'S recreation expense of $50 per month, most of which he apparently spends on lottery tickets. ECMC argues that spending money for lottery tickets is neither reasonable nor necessary. ECMC's focus on the lottery tickets is misplaced. Everyone, even a bankruptcy debtor who seeks to discharge a student loan debt, is entitled to allocate a small amount of monthly income to discretionary or recreational purposes, which allocation, by definition, is not for a necessity. In the Court's view, $50 per month for recreation is neither excessive nor unreasonable. Whether used for dining out or movies or bowling or gambling is of no consequence. The amount is small and reasonable. Courts are not in the business of deciding which recreational activities are acceptable and which are not.

Using the DEBTOR'S overly optimistic projected expenses of $1,010 per month, he has $53 available in net disposable income to pay on the student loan debt. If his expenses for food, clothing and transportation are increased to more realistic figures, he would have no funds available. Since interest on the consolidated loan is accruing at the rate of $264 each month, the DEBTOR does not have the ability to pay the loan while maintaining a minimal standard of living.[2]

---

[2] ECMC also contends that the DEBTOR qualifies for the Income Based Repayment option available through the Department of Education's William D. Ford Direct Consolidation Loan Program, and that under his current circumstances, DEBTOR'S payment would be $0. However, the first prong of the *Brunner* test requires the Court to presume a scenario under which the student loan is actually being paid down. A $0 payment does not satisfy that presumption.

7

**B. Future Inability to Repay**

The second prong of the *Brunner* test directs the Court to determine, apart from the fact that the DEBTOR cannot presently pay the consolidated loan, whether additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period.

The DEBTOR is a non-executive level employee of a not-for-profit organization, the Salvation Army. His bachelor's degree in journalism is of no use to him. He is 57 years old and has no significant retirement savings and no pension. He has no demonstrated special skills or experience that make it likely he could obtain a better paying job. Moreover, his expenses, already bare-boned, are likely to increase as he passes into his 60's.

Given that the loans first became payable in 1997, his inability to pay has already persisted for a significant portion of the repayment period and is likely to persist for its remainder. Unfortunately, this is a situation where the student loan borrower's degree did not translate into higher wages.

**C. Good Faith**

The third prong of the *Brunner* test requires the Court to determine whether the DEBTOR has made a good faith effort to repay the student loans. Preliminarily, it should be noted that this is not a case where a borrower played the bankruptcy card shortly after the student loan went into payment status. More than ten years elapsed before the DEBTOR sought bankruptcy relief. The DEBTOR testified that he made the required loan payments for a two-year period after he graduated from college. ECMC criticizes the DEBTOR for failing to corroborate it with documentary support. But ECMC failed to

8

produce any contradictory evidence even though, presumably, it has or had access to a complete payment history. The Court accepts the DEBTOR'S testimony as truthful and factually accurate.

The DEBTOR testified that he stopped making the loan payments when his income decreased and he could no longer afford them. Once again, this testimony was unrebutted, so the Court accepts it as truthful and factually accurate.

The DEBTOR sought and obtained a consolidation of his student loans in 2001. According to his unrebutted testimony, he also sought and was granted approximately five forbearances. Loan restructurings, deferments and forbearances are properly considered to be evidence of a debtor's good faith. *In re Scott,* 417 B.R. 623, 632 (Bankr.W.D.Wash. 2009). Implicit in the granting of a forbearance by a lender is the determination that the borrower lacks a current ability to pay. *In re Brown,* 249 B.R. 525, 530 (Bankr.W.D.Mo. 2000).

ECMC contends that the DEBTOR'S failure to take advantage of available options such as the income contingent repayment program and the income based repayment program evidence a lack of good faith. Under these programs, because of his low income, the DEBTOR would not be required to make any payments currently. Such programs may be appropriate and beneficial for a borrower whose inability to pay is temporary and whose financial situation is expected to improve significantly in the future. Where no significant improvement is anticipated, however, these programs may well be detrimental to the long-term financial health of a borrower. *See In re Denittis,* 362 B.R. 57, 64-65 (Bankr.D. Mass. 2007). *See, also, In re Booth,* 410 B.R. 672 (Bankr.E.D.Wash. 2009) (income contingent repayment program, providing for deferral of payments, not discharge, is

9

antithetical to fresh start provided by bankruptcy relief). Given his age and circumstances, the DEBTOR is clearly justified in seeking a discharge of the consolidated loan rather than entering an income based program that would likely force him to live under the spectral shadow of the unpaid loan for all or most of the rest of his life.

Under the circumstances, the DEBTOR'S failure to pursue any of the available income based programs does not evidence a lack of good faith. *See Educational Credit Management Corp. v. Curiston,* 351 B.R. 22, 33 (D.Conn. 2006) (debtor's failure to apply for ICRP excused where debtor could not afford to pay even a partial payment amount). The Court determines that the DEBTOR has sustained his burden to prove that he has made a good faith effort to repay the student loans.

## **CONCLUSION**

For the foregoing reasons, the Court determines that repayment of the consolidated loan would impose an undue hardship on the DEBTOR and should be discharged under 11 U.S.C. § 523(a)(8). Judgment shall enter for the DEBTOR. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###